256 P.3d 1138 (2011)
171 Wash.2d 623
SAMANTHA A., Respondent,
v.
DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Appellant.
No. 84325-2.
Supreme Court of Washington, En Banc.
Argued November 9, 2010.
Decided May 26, 2011.
*1139 William Bruce Work, Edward J. Dee, Office of the Attorney General, Social and Health Services Division, Olympia, WA, for Appellant.
Regan Bailey, Susan L. Kas, Disability Rights Washington, Eleanor Hamburger, Sirianni Youtz Meier and Spoonemore, Seattle, WA, for Respondent.
Daniel S. Gross, Janet Chantal Varon, Northwest Health Law Advocates, Seattle, WA, amicus counsel for ARC of Washington State, National Health Law Program, Northwest Health Law Advocates, and TEAMCHILD.
Amy Louise Crewdson, Columbia Legal Services, Olympia, WA, amicus counsel for Columbia Legal Services.
C. JOHNSON, J.
¶ This case involves a challenge to a Department of Social and Health Services (DSHS) regulation, WAC 388-106-0213, that reduces the financial assistance payable for in-home personal care services (based upon the child's age and whether the child lives with a parent). The superior court found this regulation invalid as violating federal Medicaid comparability requirements under 42 U.S.C. § 1396a and Medicaid Early and Periodic Screening Diagnosis and Treatment (EPSDT) laws under 42 U.S.C. § 1396d. The superior court also awarded respondent Samantha A. attorney fees under RCW 74.08.080.
¶ 2 We affirm the superior court in part and hold that WAC 388-106-0213 violates federal comparability requirements under 42 U.S.C. § 1396a. Furthermore, we hold WAC 388-106-0130 invalid to the extent it authorizes WAC 388-106-0213. We also affirm the superior court's award of attorney fees. Because we find WAC 388-106-0213 invalid based on federal comparability requirements, we decline to reach or decide any other issues.

FACTS
¶ 3 Samantha A. is a 15-year-old[1] with a wide range of medical maladies.[2] Samantha is unable to perform a majority of the activities of independent daily living. Samantha has difficulty speaking and being understood. She is assaultive, disrobes in public, and wanders away if unsupervised. Samantha requires assistance with mundane tasks such as eating, using the restroom, dressing, and personal grooming.
¶ 4 DSHS has determined that Samantha is eligible for 24-hour institutional care because of the extreme nature of her needs. Because Samantha is cared for by a single mother committed to meeting Samantha's needs, Samantha is enrolled in the Medicaid Home and Community Based Waiver program, so she can receive benefits at home and not be institutionalized. As part of these *1140 in-home benefits, Samantha receives Medicaid personal care (MPC).
¶ 5 DSHS determines a child's MPC service level using DSHS's Comprehensive Assessment Reporting Evaluation (CARE) formula. Numerous regulations govern the operation of the CARE assessment formula. See WAC 388-106-0050 through-0235. In the initial stage of a CARE evaluation, the individual is scored on factors such as an individual's ability to perform daily activities and an individual's mental status. The individual is then assigned to 1 of 17 classification groups, each group having a set number of base MPC hours associated with it. WAC 388-106-0125. Once these base hours are established, an assessor individually considers the recipient's self-performance and the amount of informal support available for the recipient's activities of daily living (ADL) and instrumental activities of daily living (IADL).[3] The recipient's level of informal support for each ADL and IADL then reduces the base hours allocated to that recipient by a predetermined percentage. WAC 388-106-0130. This process is the same for children and for adults.
¶ 6 In 2005, DSHS adopted changes to its CARE assessment formula to be applied solely to children. Included in the changes was a new rule, WAC 388-106-0213, which establishes automatic reductions to a child's base MPC hours. This new rule mechanically categorizes certain ADL and IADL as being "met" based solely upon a child's age. The rule also further reduces a child's base MPC hours by mandating that the "status and assistance available are met or partially met over three-fourths of the time" if the child lives with their legally responsible natural parent, stepparent, or adoptive parent. WAC 388-106-0213(3).
¶ 7 DSHS regulations do not require consideration of evidence from a child's medical provider regarding the amount of MPC services necessary to support a disabled child's condition. DSHS regulations also do not allow recipient children to challenge the automatic reductions imposed by WAC 388-106-0213 by showing their needs are still unmet following the reductions. DSHS does provide a process for seeking an exception to rule (ETR) from department staff, but this process does not grant any administrative hearing rights to denials of these ETR requests. See WAC 388-106-0140; WAC 388-440-0001.
¶ 8 Before the implementation of WAC 388-106-0213, DSHS assessed Samantha as needing 90 hours of MPC. The following year, Samantha was reassessed under the new rule. The new assessment showed that Samantha was exhibiting increased behavioral problems affecting her ability to complete personal care tasks. The new assessment calculated that Samantha still required 90 base MPC hours. However, pursuant to WAC 388-106-0213, the CARE formula automatically reduced these 90 base hours to 39 hours. In effect, the CARE formula classified many of Samantha's dressing, eating, hygiene, and transportation needs as being met because of her age and because she lived with her mother. Although Samantha was eligible for 24-hour institutional care and had previously been assessed to require an average of three MPC hours daily, WAC 388-106-0213 operated to reduce Samantha's MPC hours to just over one hour a day.
¶ 9 Samantha's mother requested an ETR hearing to contest the reduction of MPC hours. Samantha's medical provider conducted an EPSDT exam[4] and determined that Samantha required 96 hours of MPC in order "to maximize her potential and achieve her best possible functional level." Ex. 8 (Mot. to Transfer to Washington State Supreme Ct.) at 8. DSHS neither approved *1141 additional MPC hours nor granted Samantha an ETR exception. The administrative record does not show that DSHS considered, weighed, or integrated the recommendations of Samantha's medical provider.
¶ 10 Samantha petitioned the Thurston County Superior Court for review. The superior court found that WAC 388-106-0213 violated federal Medicaid comparability and EPSDT laws. Furthermore, the superior court invalidated another rule, WAC 388-106-0130(3)(b), to the extent that it authorizes WAC 388-106-0213. The superior court also awarded Samantha attorney fees. DSHS appealed to Division Two of the Court of Appeals. This court then granted Samantha's motion to transfer.

ISSUES
1. Whether WAC 388-106-0213 violates federal Medicaid comparability requirements.
2. Whether the superior court properly awarded Samantha attorney fees under RCW 74.08.080.

ANALYSIS
¶ 11 The Administrative Procedure Act provides that in a proceeding involving review of administrative rules, "the court shall declare the rule invalid only if ... the rule exceeds the statutory authority of the agency... or the rule is arbitrary and capricious." RCW 34.05.570(2)(c).
¶ 12 We review an agency interpretation of federal law de novo under an "error of law" standard. Skamania County v. Columbia River Gorge Comm'n, 144 Wash.2d 30, 42, 26 P.3d 241 (2001) (citing Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 175-76, 4 P.3d 123 (2000)).

1. Whether WAC 388-106-0213 violates federal Medicaid comparability requirements.
¶ 13 MPC is a Medicaid state plan program authorized under 42 U.S.C. § 1396d(a)(24) and RCW 74.09.520(2). As a voluntary participant in the federal Medicaid program, Washington State must comply with Medicaid statutes and related regulations. S.A.H. ex rel. S.J.H. v. Dep't of Soc. & Health Servs., 136 Wash.App. 342, 348, 149 P.3d 410 (2006). DSHS administers Medicaid medical assistance programs in Washington State. RCW 74.04.050; RCW 74.09.500.
¶ 14 The federal Medicaid comparability provision mandates that a state Medicaid plan must provide "that the medical assistance made available to any individual ... shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i); see also 42 C.F.R. § 440.240(b). As with all Medicaid services, states "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d).
¶ 15 WAC 388-106-0130(3)(b) mandates DSHS to reduce MPC service hours for children under the age of 18 pursuant to the framework established in WAC 388-106-0213. Under WAC 388-106-0213(2), DSHS provides automatic cuts to MPC hours based upon a child's age. Also, under WAC 388-106-0213(3), DSHS reduces MPC hours based upon a presumption that a child's needs are "met or partially met" when that child lives with a legally responsible natural parent, stepparent, or adoptive parent.
¶ 16 DSHS argues that WAC 388-106-0213(2) properly withholds payment for assistance with needs that are based upon age, not disability. DSHS reasons that all children below certain ages are presumed to have the same personal care needs. Put another way, DSHS argues that assisting a four-year-old with bathing fulfills a developmental need, not a medical need; therefore, DSHS will withhold providing paid assistance regarding bathing needs for all four-year-old children. DSHS also argues that the age- and parent-based reductions in WAC 388-106-0213 create a global benchmark in order to avoid paying for a service that is unrelated to a child's disability. Thus, the question posed to us here is whether DSHS violates federal Medicaid comparability requirements by promulgating a rule that creates across-the-board coverage reductions based solely *1142 upon a child's age and whether the child lives with a parent.
¶ 17 This court addressed a similar issue in Jenkins v. Department of Social & Health Services, 160 Wash.2d 287, 157 P.3d 388 (2007). In Jenkins, we invalidated a DSHS regulation, known as the "shared living rule," that automatically reduced a recipient's benefits by 15 percent because they lived with their paid caregiver. Like the reductions imposed under WAC 388-106-0213 in this case, the shared living rule operated to reduce the base number of hours determined to be appropriate after DSHS's initial CARE assessment. In holding the shared living rule invalid, we specifically instructed that
DSHS may use the CARE assessment program to initially classify, rate, and determine a recipient's level of need because this process is consistent with the Medicaid program's purpose. DSHS violates the comparability requirement when it reduces a recipient's benefits based on a consideration other than the recipient's actual need.
Jenkins, 160 Wash.2d at 299, 157 P.3d 388. We further clarified by stating, "Once a person is assessed to require and receive a certain number of care hours, the assessment cannot be reduced absent a specific showing that fewer hours are required. To `presume' some recipients need fewer hours of care without individualized determination violates the comparability requirement." Jenkins, 160 Wash.2d at 300, 157 P.3d 388.
¶ 18 Our holding in Jenkins controls the resolution of this case. Subsections (2) and (3) of WAC 388-106-0213 establish irrebutable presumptions in the CARE formula that diminish a recipient's care hours without an individualized determination of need. Because the regulation fails to account for an individual recipient's actual needs and because the regulation treats similarly situated recipients differently, WAC 388-106-0213 is invalid under federal comparability requirements.
¶ 19 DSHS argues that WAC 388-106-0213(2) properly withholds payment for care or services related to a child's developmental care. But this ignores what the regulation actually does. The regulation reduces MPC benefits based upon a consideration other than a recipient's actual need. Although routine assistance with daily bathing fulfills a developmental care requirement for a healthy four-year-old child, a disabled four-year-old may need significantly greater assistance with bathing or may even need multiple daily baths. While one disabled child may only require 30 minutes a day to meet her individualized bathing needs, another similarly disabled child may require two or three times more assistance. But instead of addressing the actual needs of an individual recipient, WAC 388-106-0213(2) operates to deny coverage based solely upon age and not upon the existence or extent of disability.
¶ 20 WAC 388-106-0213(3) is equally flawed. On its face, the rule treats similarly situated individuals differently because children with comparable disabilities are treated differently based not upon need, but upon whom the child lives with. Under the presumptions contained in WAC 388-106-0213(3), a child living with a legally responsible parent has her MPC hours reduced while a child living with a caregiver, or any other person exercising custodial responsibility, retains more payable MPC hours because the reductions imposed by WAC 388-106-0213(3) would not apply. In other words, two categorically needy recipients who are individually assessed as requiring the same needs will ultimately be treated differently simply because one recipient lives with a legally responsible parent and the other lives with someone other than a parent.
¶ 21 Subsections (2) and (3) of WAC 388-106-0213 rely on DSHS's presumptions regarding what needs are developmental in nature and what needs should be provided by a legally responsible parent. However, in Jenkins we specifically noted that DSHS's presumptions cannot be used to avoid an individualized determination of a recipient's actual need. Jenkins, 160 Wash.2d at 300, 157 P.3d 388 ("To `presume' some recipients need fewer hours of care without individualized determination violates the comparability requirement.").
¶ 22 DSHS essentially argues that the presumptions in WAC 388-106-0213 create valid *1143 utilization control measures necessary to ensure that DSHS pays only for care-related needs and not for developmental needs. While, as a general matter, DSHS may establish utilization control criteria, DSHS's argument is unavailing in the present case because WAC 388-106-0213 functionally ignores the particular needs of any disabled child. DSHS's power to place limits on eligibility and assistance requirements is not unfettered, but is limited by federal comparability requirements that any individual's "medical assistance ... shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i). Federal Medicaid law further mandates that utilization control measures shall "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services." 42 U.S.C. § 1396a(a)(30)(A) (emphasis added).
¶ 23 Despite DSHS's assertion that WAC 388-106-0213 essentially establishes utilization control parameters, there is no mechanism within WAC 388-106-0213 targeting the regulation at the "unnecessary" utilization of care and services. Determining whether care or services are "unnecessary" impliedly involves determining whether a particular recipient requires such care or services. This is what occurs during the initial CARE evaluation when the recipient is placed into 1 of 17 classification groups. This is also what occurs when the recipient's base MPC hours are later reduced by an assessor's individualized findings regarding the recipient's self-performance and the amount of informal supports for ADL and IADL.
¶ 24 Unlike these reductions applied earlier in the CARE formula, the reductions contained in WAC 388-106-0213 are not based on the actual needs of any individual recipient. To the contrary, WAC 388-106-0213 relies upon DSHS's presumptions about what care is already being provided to children of certain ages and to children living with a parent. But DSHS's presumptions are problematic for several reasons. First, DSHS's age- and parent-based presumptions cannot be refuted by showing that a child's actual needs are still not being met following the reduction. While DSHS's regulations provide for an ETR proceeding to contest the reduction, the challenging party has no fair hearing rights regarding ETR proceedings. See WAC 388-106-0140; WAC 388-440-0001. In this case, Samantha was denied an ETR despite having a medical provider recommendation indicating that Samantha required roughly the same amount of MPC hours as the initial CARE assessment provided her. Second, DSHS fails to show the basis or process that the department relied upon to arrive at its presumptions regarding the age- and parent-based needs of a child. Neither the rule-making file nor the administrative record contains any time-study, evaluation, or any other evidence to support DSHS's presumptions. Clerk's Papers at 253. In this case, Samantha's MPC hours were reduced from 90 to 39, approximately a 56 percent decrease in hours. DSHS does not produce any evidence showing how it arrived at a 56 percent reduction. Nor does DSHS produce any evidence showing why the reduction cannot be 40 percent, 30 percent, or even 5 percent. In short, DSHS's age- and parent-based reductions represent arbitrary amounts applied without any supporting evidence and without regard to an individual recipient's actual needs.
¶ 25 DSHS argues that the initial CARE assessment provides a sufficiently individualized determination of a disabled child's needs. As support, DSHS points to the extensive criteria embodied in the regulations governing the CARE assessment process. But this argument is contradicted by our holding in Jenkins in which we stated that, following the initial CARE assessment, the base level of MPC hours cannot be reduced absent a "specific showing" that fewer hours are necessary. Jenkins, 160 Wash.2d at 300, 157 P.3d 388. In this case, Samantha's base MPC hours were mechanically reduced from 90 to 39 hours without any personalized determination that Samantha's needs would continue to be met. There is nothing in the record before this court to show that DSHS *1144 made any determination that Samantha's needs would be met.[5]
¶ 26 DSHS also presents an additional justification specific to WAC 388-106-0213(3), which reduces MPC hours when a child lives with a "legally responsible natural/step/adoptive parent." DSHS argues that parents have statutory obligations to provide care for their children. Since Medicaid is a "payor of last resort," DSHS reasons that they must identify third parties that may be responsible for a portion of the services otherwise provided by Medicaid. Br. of Appellant at 30. In response, Samantha persuasively argues that DSHS incorrectly equates MPC services with the care provided by all parents to their children.
¶ 27 The statutes that DSHS relies upon to justify its parent-based reductions are not instructive in this case. DSHS first points to RCW 26.09.002 ("Parents have the responsibility to make decisions and perform other parental functions necessary for the care and growth of their minor children."). But this statute applies to domestic relations, and more specifically, to provide guidance for creating parenting plans following a dissolution of marriage. DSHS fails to indicate how this statute controls when determining the amount of in-home medical assistance available for a disabled child. Second, DSHS cites RCW 74.13.350 ("It is the intent of the legislature that parents are responsible for the care and support of children with developmental disabilities."). Although this statute pertains to children with developmental disabilities, this statute specifically addresses voluntary placement agreements when placing foster children in out-of-home care facilities.[6] Again, DSHS fails to show how this statute applies under the facts of this case. Furthermore, if we were to apply RCW 74.13.350 in the manner that DSHS asserts we should, the statute would presumably allow DSHS to reduce a developmentally disabled child's MPC hours to zero. We decline to do so.[7]
¶ 28 MPC services are unlike the care parents typically provide to their children because MPC services are "medical assistance" administered by DSHS in compliance with federal requirements. RCW 74.09.500,.520. Furthermore, MPC providers are statutorily required to obtain specialized training before[8] caring for the disabled and there is *1145 nothing in the statutes cited by DSHS to suggest that parents must acquire specialized medical training simply to parent a disabled child.[9]
¶ 29 Consistent with our holding in Jenkins, we affirm the superior court and hold that the reductions embodied in WAC 388-106-0213(2) and (3) violate federal Medicaid comparability requirements because the reductions are imposed without any consideration of a child's individualized circumstances or whether a child's needs will continue to be met after the reduction.[10]

2. Whether the superior court properly awarded Samantha attorney fees under RCW 74.08.080.
¶ 30 Pursuant to RAP 18.1(a), respondents request attorney fees on appeal under RCW 74.08.080.[11] Because respondents prevail, we grant their request. Additionally, DSHS disputes the roughly $85,000 in attorney fees awarded to Samantha by the superior court. DSHS argues that the superior court should have capped its award at $25,000 pursuant to the Equal Access to Justice Act (EAJA). See RCW 4.84.350(2) ("The amount awarded a qualified party under subsection (1) of this section shall not exceed twenty-five thousand dollars."). DSHS argues that the EAJA is the basis for attorney fees for judicial reviews of agency actions, including eligibility for MPC services; therefore, the EAJA should apply in this case, in which the issue centers on the available amount of MPC services. DSHS asserts that it is illogical that judicial action to determine the amount of services should permit the appellant to receive greater attorney fees than a judicial action to determine overall eligibility for services.
¶ 31 DSHS's argument is unsupported by the statutory language of the EAJA. The EAJA states: "Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action ... reasonable attorneys' fees." RCW 4.84.350(1) (emphasis added). In this case, the superior court's award of attorney fees was otherwise provided by statute, namely RCW 74.08.080(3) (providing "reasonable attorneys' fees" for an appellant challenging an adjudicative order entered in a public assistance program). Therefore, the EAJA does not apply to the case before us. We affirm the superior court's order awarding reasonable attorney and costs.

CONCLUSION
¶ 32 We affirm the superior court and hold that WAC 388-106-0213 is invalid against federal Medicaid comparability requirements. We further hold that WAC 388-106-0130(3)(b), to the extent that it authorizes WAC 388-106-0213, is invalid. We also uphold the superior court's award of attorney fees and grant respondent Samantha's reasonable attorney fees and costs on appeal.
*1146 WE CONCUR: GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, Justices, and RICHARD B. SANDERS, Justice Pro Tem.
STEPHENS and J.M. JOHNSON, JJ., dissent.
MADSEN, C.J. and FAIRHURST, J., concurred in dissent.
Justice WIGGINS did not sit.
STEPHENS, J. (dissenting).
¶ 33 I disagree with the majority's conclusion regarding the invalidity of WAC 388-106-0213, the children's personal care rule. At issue here is the Department of Social and Health Services' (DSHS) allotment of Medicaid dollars to pay for personal care services. Personal care services consist of "physical or verbal assistance with activities of daily living (ADL) and instrumental activities of daily living (IADL)." WAC 388-106-0010. ADLs include in total: bathing, bed mobility, body care, dressing, eating, locomotion in the home, locomotion outside the home, walking in the home, medication management, toilet use, transfer (such as from sitting to standing), and personal hygiene. Id. IADLs include in total: meal preparation, ordinary housework, essential shopping, wood supply (if wood is the sole source of fuel for heating and/or cooking), travel to medical services, managing finances, and telephone use. Id.
¶ 34 The children's personal care rule limits the amount of paid care a child may receive for personal care services (i.e., assistance with ADLs and IADLs) based on the premise that a parent will provide many of these same services as part of his or her parental responsibilities. The so-called comparability provision of 42 U.S.C. § 1396a(a)(10)(B)(i) requires that a state Medicaid plan must provide "that the medical assistance made available to any individual... shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." Medical assistance is defined as "payment of part or all of the cost" of enumerated services like personal care services. 42 U.S.C. § 1396d(a). Thus, in plain terms, the Medicaid statutes do not require a state to cover the entire cost of medical assistance. Rather, the State has the ability to "place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d).
¶ 35 The question here is whether DSHS has placed appropriate limits on paid personal care services by recognizing the obligation of parents to provide unpaid support for their children. Put another way, this court must decide whether the Medicaid comparability provision requires a state to pay for 100 percent of a client's assessed personal care needs with Medicaid dollars.
¶ 36 The clear answer is no. As noted, medical assistance itself is defined as partial or full payment of a service. And a state may place appropriate limits on a service. The majority errs when it reads the comparability provision as requiring the state to pay for all of every client's assessed needs. The error flows from a misunderstanding of how the comparability provision's requirements are met by DSHS's rule. The majority concludes the comparability provision requires total payment because the majority believes the limits at issue are not based on an individualized assessment of the client's actual need. See majority at 1142 (citing Jenkins v. Dep't of Soc. & Health Servs., 160 Wash.2d 287, 299, 157 P.3d 388 (2007) (observing that "DSHS violates the comparability requirement when it reduces a recipient's benefits based on a consideration other than the recipient's actual need")). But an individualized assessment of the client's actual need is exactly what occurred here.
¶ 37 Using its comprehensive assessment reporting evaluation (CARE) tool, DSHS assessed Samantha's need for personal care hours at 90 hours. This assessment considered a range of information, including information from medical providers. The question then becomes how many of the 90 hours will be delivered by a paid provider funded through Medicaid dollars and how many will be delivered by nonpaid supportin this case, Samantha's mother.[1] To be clear, under *1147 DSHS's assessment, all of Samantha's personal care needs are met; only some are met through paid care using Medicaid dollars. This is entirely consistent with the definition of medical assistance under 42 U.S.C. § 1396d(a) and the State's ability to limit services under 42 C.F.R. § 440.230(d), and it is consistent with the Jenkins requirement that limitations be tied to actual need because Samantha's needs are met.[2] To read the comparability provision as the majority doesi.e., that comparable services means every client receives total paid care is to obliterate the State's prerogative under federal statute and regulation to allocate partial payment for services and to place appropriate limits on already scarce resources. One questions how any limitation on paid services could survive the majority's analysis.
¶ 38 The fact that the children's personal care rule limits a child's paid personal care services based on a presumption tied to the child's age does not render the limitation inappropriate. It simply recognizes that a child of a certain age will need some personal care from a parent regardless of disability. The majority contends that the presumption is not individualized enough to satisfy the comparability provision: "In this case, Samantha's base MPC [Medicaid personal care] hours were mechanically reduced from 90 to 39 hours without any personalized determination that Samantha's needs would continue to be met." Majority at 1143.
¶ 39 But as noted, under DSHS's assessment, Samantha's needs were individually assessed using CARE and all of Samantha's assessed personal care needs are met, either by a parent or a paid provider. The individualized determination that would be needed to allay the majority's concerns in this regard would not have to do with Samantha; it would have to do with her mother. That is, the majority requires that DSHS determine whether Samantha's mother is capable or available to provide care for her child. While the very difficult trials faced by a parent of a disabled child are a serious reality, the fact is that DSHS must take into account the needs of Samantha, not the needs of her parent. As a custodial parent, Samantha's mother is legally responsible for providing care that is akin to personal care services, and it is appropriate for DSHS to presume she will do so.[3]
¶ 40 The majority believes that personal care services "are unlike the care parents typically provide to their children because MPC services are `medical assistance' administered by DSHS in compliance with federal requirements" and Medicaid personal care providers "are statutorily required to obtain specialized training before caring for the disabled." Majority at 1144 (footnote omitted). While it is hardly surprising that individuals receiving pay with Medicaid dollars must receive some sort of specialized training before contracting with the State, that does not mean unpaid personal care is not delivered by a family member. The federal center for medicaid services has recognized as much. "We believe spouses and parents are inherently responsible for meeting the personal care needs of their family members, and, therefore, it would not be appropriate to allow Medicaid reimbursement for such services." Medicaid Program; Coverage of *1148 Personal Care Services (Supplementary Information), 61 Fed. Reg. 9405, at 9407 (proposed Mar. 8, 1996) (codified at 42 C.F.R. pt. 440). It simply belies common sense to claim that personal care servicestasks such as bathing, dressing, and feedingare not akin to the things a parent does for a child every day.
¶ 41 Whether Medicaid-funded or not, personal care services are exactly like the daily tasks parents perform on behalf of their children. The majority worries that "two categorically needy recipients who are individually assessed as requiring the same needs will ultimately be treated differently simply because one recipient lives with a legally responsible parent and the other lives with someone other than a parent." Majority at 1142. But the disabled child who does not live with a legally responsible adult may therefore have no support available to him or her that does not need payment. Thus, the child's assessed needs cannot be met any other way than through paid personal care. Under either scenario, however, DSHS's assessment accounts for the individual client's needs.[4]
¶ 42 Contrary to the majority's belief, Jenkins does not control here. In Jenkins, we rejected the use of a presumption to avoid an individualized determination of a client's actual need. Jenkins, 160 Wash.2d at 300, 157 P.3d 388. As noted above, the process here does account for an individual's actual need, but further defines how much of that need may be met by paid care as opposed to nonpaid support, here a parent. The presumption at issue in Jenkins assumed that a caregiver spent time doing some daily tasks that benefited the caregiver and the client, such as housekeeping and meal preparation. DSHS reduced a client's paid hours by 15 percent for the time a caregiver spent on tasks that presumably benefited both the client and the caregiver. But there was no indication that a caregiver did in fact duplicate tasks or that the 15 percent reduction in any way accurately reflected such duplication. Jenkins, 160 Wash.2d at 292, 157 P.3d 388 (noting that "DSHS determined 15 percent was appropriate based on the study's conclusion that the percentage of time devoted by live-in caregivers to household tasks ranged from 33 percent to 42 percent but, DSHS does not explain in the study or elsewhere how it arrived at the 15 percent figure"). To the extent any presumption exists here, it is a presumption of law, i.e., a parent is responsible for providing care for a child. This is markedly different from the presumption of fact at issue in Jenkins.[5]
¶ 43 Moreover, it is a misnomer to describe the limitation here as an "across-the-board reduction[ ]." Second Am. Br. of Resp't at 23. The children's personal care rule takes into account appropriate developmental milestones for a child at a certain age. Thus, the rule will function differently for a five year old, than for a 10 year old, than for a 15 year old. Unlike the rule invalidated in Jenkins, the children's personal care rule does not treat all similarly situated clients the same regardless of individual circumstances. It is not a mechanical reduction. See majority at 1143.
¶ 44 Echoing Samantha's argument, the majority faults DSHS for the absence of time studies or other such empirical data supporting its benchmark determinations of a child's independent functioning based on age. Majority at 1143; Second Am. Br. of Resp't at 34. Although not entirely clear from Samantha's briefing, this appears to be an argument that the children's personal care rule is *1149 arbitrary and capricious, an entirely separate claim from an assertion that the rule violates Medicaid's comparability provision. The burden is on a party challenging an administrative rule to demonstrate it is arbitrary and capricious. Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 148 Wash.2d 887, 903, 64 P.3d 606 (2003) (citing RCW 34.05.570(1)(a)).
[W]hen a rule is challenged as arbitrary and capricious, the reviewing court must consider the relevant portions of the rule-making file and the agency's explanations for adopting the rule as part of its review in order to determine whether the agency's action was willful and unreasoning and taken without regard to the attending facts or circumstances.
Id. at 906, 64 P.3d 606. While the rule-making file here does not contain data explaining DSHS's age guidelines, neither is there any evidence presented in the rule-making file or elsewhere that the guidelines are based on arbitrary or unreasoning action, or taken without regard to the attendant facts and circumstances. The majority errs by placing the burden on DSHS to produce evidence that its action is reasonable, particularly when the evidence the majority requirestime studies or the likeis not required by the Administrative Procedure Act, chapter 34.05 RCW.[6]
¶ 45 Because the limitation imposed on paid personal care services under the children's personal care rule is valid, I would uphold the application of the rule to Samantha. This rule reasonably accounts for the obligation of a custodial parent to provide for a child's basic care. Moreover, application of the rule follows an individualized assessment of the child's needs and comports with Medicaid requirements. I respectfully dissent.
I CONCUR: JAMES M. JOHNSON, Justice.
MADSEN, C.J. (concurring in dissent).
¶ 46 I concur in the dissent. However, I disagree that our decision in Jenkins v. Department of Social & Health Services, 160 Wash.2d 287, 157 P.3d 388 (2007), is distinguishable. In that case, the department reduced a recipient's qualified level of care hours by the percentage of time devoted by live-in caregivers to household tasks if a caregiver resides with a recipient on the assumption that the caregiver benefited from those tasks as well. I see little difference between this case and Jenkins in that the department here reduces the recipient's care hours through a formula designed to capture the hours of care that a parent provides as part of parental responsibility based on age. As in Jenkins, this formula also rests on an assumption that the parent is meeting the child's needs. Nevertheless, because I agree with the dissent's analysis and believe it is inconsistent with Jenkins, I would overrule Jenkins as incorrect and harmful.
NOTES
[1] Samantha was 12 years old when this appeal began.
[2] Samantha's conditions include: Down's Syndrome, obesity, vision issues and cataracts, hearing loss, speech and communication problems, developmental delay, and behavioral issues.
[3] ADLs are defined to include: ability to bathe, bed mobility, body care, dressing, eating, locomotion both in the living environment and outdoors, medication management, toilet use, and personal hygiene. IADLs include: meal preparation, ordinary housework, essential shopping, wood supply, travel to medical services, financial management ability, and telephone use. See generally WAC 388-106-0010.
[4] EPSDT allows authorized medical service providers to issue referrals for services for children under the age of 21 who are eligible for Medicaid. See WAC 388-534-0100(2)(a)(i). Access and services for EPSDT are governed by federal rules at 42 C.F.R., pt. 441, subpt. B.
[5] We also note that Samantha's medical provider assessed Samantha as needing 96 hours of MPC care. Therefore, both the initial CARE assessment and Samantha's medical provider arrived at a similar figure for base MPC hours. Despite this recommendation and despite DSHS not presenting any evidence contradicting this recommendation, WAC 388-106-0213 automatically reduced Samantha's MPC hours to 39.
[6] The language of RCW 74.13.350 makes it clear that the statute was not intended to be used in the manner DSHS now asserts. RCW 74.13.350 states:

It is the intent of the legislature that parents are responsible for the care and support of children with developmental disabilities. The legislature recognizes that, because of the intense support required to care for a child with developmental disabilities, the help of an out-of-home placement may be needed. It is the intent of the legislature that, when the sole reason for the out-of-home placement is the child's developmental disability, such services be offered by the department to these children and their families through a voluntary placement agreement.
As the text details, RCW 74.13.350 applies in situations in which the child's developmental disability is such that the parents are unable to care for the child. But this is not implicated by the facts in the present case. Samantha's mother seeks to care for Samantha at home in order to prevent institutionalization, not place Samantha in a foster home.
[7] DSHS also argues that courts have interpreted federal Medicaid law to support holding that parents are primarily responsible for the care and support of children with developmental disabilities, therefore parents should shoulder the responsibility of paying for purely parental functions. DSHS first cites Poindexter v. Department of Human Services, 372 Ill.App.3d 1021, 869 N.E.2d 139, 311 Ill.Dec. 465 (2006). But Poindexter involved a determination of financial eligibility for Medicaid under the Medicare Catastrophic Coverage Act of 1988; therefore this citation is not instructive given the particular facts of this case. DSHS also cites Germosen v. Gupta, 237 A.D.2d 121, 654 N.Y.S.2d 746 (1997). The Germosen holding involved whether the availability of Medicaid operates to preclude recovery against tortfeasors. Again, this citation is not helpful in the case currently before us.
[8] RCW 74.39A.073(1) ("[A]ll persons employed as long-term care workers for the elderly or persons with disabilities must meet the minimum training requirements in this section."); see also RCW 74.39A.075 (detailing training required in order for a parent to be the individual provider for a disabled adult or child).
[9] In additional briefing to the court, DSHS argues that its regulations specifically exempt parents of disabled children from the training requirements that apply to other personal care providers. WAC 388-825-355(2) ("If you provide personal care for children ... there is no required training but DDD [ (division of developmental disability) ] retains the authority to require training of any provider"). DSHS's argument is unpersuasive because the regulation cited by DSHS applies to "individuals and agencies contracted with to provide ... [p]ersonal care services." WAC 388-825-305(2) (emphasis added). There is nothing before this court to indicate that Samantha's mother contracted with DSHS to provide MPC services to Samantha.
[10] We need not resolve any issues regarding the amount of deference that DSHS must give medical provider recommendations under federal EPSDT law. Since Samantha's medical provider issued a recommendation that nearly corresponded with the initial CARE assessment prior to the implementation of WAC 388-106-0213 (Samantha's provider recommended 96 MPC hours and the CARE assessment established a baseline of 90 MPC hours), our invalidation of the reductions contained in WAC 388-106-0213 effectively renders the issue moot.
[11] RCW 74.08.080(3) states:

When a person files a petition for judicial review ... of an adjudicative order entered in a public assistance program, no filing fee shall be collected ...; In the event that the superior court, the court of appeals, or the supreme court renders a decision in favor of the appellant, said appellant shall be entitled to reasonable attorneys' fees and costs.
[1] Samantha also spends some time enrolled as a junior high school student. The administrative law judge here determined "that some of Samantha [A.]'s needs are met while in school which presumably is a full school day." Administrative Record (AR) at 25. Samantha did not assign error to that finding. AR at 3.
[2] Samantha's counsel pointed out at oral argument that it may be more difficult for a parent to find a paid provider for only 39 hours per month as opposed to 90 hours. Wash. Supreme Court Oral Argument, Samantha A. v. Dep't of Soc. & Health Servs., No. 84325-2 (Nov. 9, 2010), at 23 min., 27 sec., video recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org. While the staffing difficulties families often face should not be underestimated, these are outside the purview of a CARE assessment.
[3] Although the record is silent as to its applicability here, it should be noted that some division of developmental disabilities clients are eligible to receive respite care, which is "short-term intermittent relief for persons normally providing care for waiver individuals." WAC 388-845-1600. Respite care cannot replace paid personal care hours available to a client. WAC 388-845-1620(3)(b). Thus, respite care and Medicaid personal care hours are not synonymous, and it should not be assumed that paid personal care hours are the only support available to a parent caring for a disabled child.
[4] The majority believes that agreeing with DSHS's position regarding parental responsibility would "presumably allow DSHS to reduce a developmentally disabled child's MPC hours to zero." Majority at 1144. But this is not so. As long as DSHS offers medical assistance in the form of personal care services, it is obligated to pay for at least part of the service. 42 U.S.C. § 1396d(a). However, under the majority's analysis today, the converse of its fears is possible. The majority's reasoning could require DSHS to pay for all of a child's assessed needs, meaning the parent is no longer responsible for the child's care at all.
[5] Because DSHS has not argued that Jenkins should be overruled, I have not considered that possibility. See concurrence in dissent (Madsen, C.J.) at 1. But to the extent that Jenkins continues to compel results invalidating a state's ability to place appropriate limits on Medicaid resources, I agree with Chief Justice Madsen's view that it is incorrect and harmful.
[6] The majority seems to suggest DSHS arbitrarily reduced Samantha's paid hours in part because it applied the children's personal care rule "despite having a medical provider recommendation indicating that Samantha required roughly the same amount of MPC hours as the initial CARE assessment provided her." Majority at 1143. The suggestion is that the medical provider's opinion needed to be considered in determining the appropriate number of paid hours. This is incorrect. The plain language of 42 U.S.C. § 1396d(a)(24) allows a state to authorize MPC hours at its total discretion. Under that statute, personal care services may be authorized "by a physician in accordance with a plan of treatment or (at the option of the State) otherwise authorized for the individual in accordance with a service plan approved by the State." Id. (emphasis added). Moreover, even if the State's assessment here did not take precedence over the medical provider's opinion as to the personal care hours needed, the doctor's opinion was not rendered in accordance with a plan of treatment, as the statute requires.