[No. 40811-2-II.   Division Two.   February 20, 2013.]

FAITH K. FREEMAN, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Paul A. Neal*, for appellant.

*Robert W. Ferguson, Attorney General*, and *William B. Work, Christina Mach*, and *Jonathon Bashford, Assistants*, for respondent.

¶1 JOHANSON, A.C.J. — The primary substantive question before us is whether general supervisory care for a disabled individual qualifies as a covered medical assistance service

under the federal Medicaid Act.[1] Faith K. Freeman seeks Medicaid benefits for supervisory services her parents provided when she was 18 to 21 years old. We affirm the Department of Social and Health Services Board of Appeals (Board) and hold it did not err (1) in concluding that the Department of Social and Health Services (Department) timely invoked appellate jurisdiction, (2) in finding general supervisory care is not a Medicaid medical assistance service, and (3) in establishing Freeman's benefit eligibility date. Additionally, we hold that the superior court did not abuse its discretion in awarding Freeman attorney fees for the superior court judicial review and, finally, that Freeman is not entitled to additional appellate attorney fees. We affirm.

## FACTS

¶2 Faith Freeman lives with and is cared for by her parents, Loren and Jean Freeman.[2] Freeman was diagnosed with Down's syndrome shortly after birth and functions at a five-year-old level.[3] Freeman also has aphasia (an impairment of language ability). Accordingly, she requires substantial assistance on a daily basis.

¶3 In July 2004, when Freeman turned 18 years old, Freeman's parents applied for Supplemental Security Income (SSI) and Medicaid. The United States Social Security Administration determined that Freeman qualified for SSI. The Department determined she was eligible for Medicaid beginning July 1, 2004. Thereafter, department employees completed annual comprehensive assessment reporting evaluations (CARE) to determine Freeman's eligibility for Medicaid personal care benefits (MPC). After each CARE assessment, the Department determined that Freeman qualified

---

[1] 42 U.S.C. § 1396d(a).

[2] For clarity, we refer to Faith Freeman as "Freeman" and Loren and Jean Freeman by their first names or as "Freeman's parents."

[3] The facts are not disputed, and only issues of law are raised.

for a certain number of service hours of MPC. Until she turned 21, Freeman also qualified for the benefits provided by the Medicaid early periodic screening, diagnosis, and treatment law (EPSDT), 42 U.S.C. § 1396d(r).

## I. INITIAL AGENCY ACTION

¶4 Due to Freeman's severe disabilities, Freeman's parents sought benefits for general supervisory care through the Department's EPSDT program. They based their request on Freeman's treating physician's EPSDT screening and his opinion that Freeman requires 24-hour, 7-days-a-week assistance. The Department denied their claim because it characterized the care provided by Freeman's parents as "supervision" and thus not covered by the EPSDT program. Clerk's Papers (CP) at 150. Freeman sought review.

¶5 On June 27, 2008, the administrative law judge (ALJ) entered an initial order awarding Freeman compensation under EPSDT for some of the requested hours. The ALJ determined that Freeman's parents could not provide Freeman's personal care services because federal law reimburses for personal care services only non-family-members provide. But the ALJ found that the services Freeman's parents provided met the definition of medically necessary rather than personal care because her doctor diagnosed her as needing "24 hour, 7 days a week" supervision. CP at 183. The ALJ concluded that Freeman's parents were entitled to compensation for 24 hours a day minus 8 sleeping hours per day and minus any time Freeman was not at home and not under her parents' care.

¶6 On July 2, the Department requested a corrected order due to clerical errors in the initial order. The next day, on July 3, the ALJ issued a "CORRECTED INITIAL ORDER" that was substantively the same as the June 27 initial order. CP at 160. The corrected order included the following notice: "THIS ORDER BECOMES FINAL ON

THE DATE OF MAILING UNLESS WITHIN 21 DAYS OF MAILING OF THIS ORDER A PETITION FOR REVIEW IS RECEIVED BY THE [DEPARTMENT] BOARD OF APPEALS." CP at 187.

## II. FINAL AGENCY ACTION

¶7 On July 16, Freeman filed a petition for review of the corrected initial order with the Department's Board. On July 22, the Department also filed a petition for review of the corrected initial order. On December 8, the Board issued its order, finding that the ALJ erred in her legal conclusions. First, the Board denied Freeman's motion to dismiss the Department's petition for review, noting the 21-day deadline for a party to file a petition for review was calculated from July 3, not June 27, and that the Department had met the deadline. The Board also ruled that Freeman was not eligible for supervisory or personal care services under the EPSDT program but that this did not mean that she was not eligible for some personal care services under the MPC program. The Board determined that since Freeman did not have a Department-approved care provider until September 1, 2004, this was when the Department must begin paying Freeman's parents. This holding reversed the Department's initial July 1 eligibility determination.

## III. SUPERIOR COURT REVIEW

¶8 Freeman petitioned the Thurston County Superior Court for review. On May 12, 2010, the superior court issued its order concluding that general supervisory services do not qualify as medical assistance under 42 U.S.C. § 1396d(a)(13) because such services are not remedial. The court found Freeman's requested services to be more properly characterized as personal care services. To the extent those services provide assistance with Freeman's activities of daily living, the superior court found they were covered under 42 U.S.C.

§ 1396d(a)(24). But to the extent the services are for supervision, it found that they were not covered under 42 U.S.C. § 1396d(a)(24).

¶9 Further, the superior court determined that Freeman's benefit eligibility date was July 1, 2004, and that the Department had to pay for services beginning on that date. The superior court also awarded Freeman 70 percent of her attorney fees incurred pursuing judicial review because she obtained relief on most but not all of the issues. Freeman appeals, and the Department cross appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

¶10 In reviewing an administrative action, we sit in the same position as the superior court, applying the standards of the Administrative Procedure Act (APA), chapter 34.05 RCW, directly to the agency record. *Brighton v. Dep't of Transp.*, 109 Wn. App. 855, 861-62, 38 P.3d 344 (2001).[4] The person challenging an agency's action bears the burden of demonstrating the invalidity of the decision. *Brighton*, 109 Wn. App. at 862. We review conclusions of law de novo to determine if the reviewing judge correctly applied the law. *Morgan v. Dep't of Soc. & Health Servs.*, 99 Wn. App. 148, 151, 992 P.2d 1023, *review denied*, 141 Wn.2d 1014 (2000).

### II. TIMELY APPEAL

¶11 As a threshold issue, Freeman argues that the Board lacks subject matter jurisdiction because the Depart-

---

[4] Under the APA, this court may reverse an agency adjudicative decision only if it determines that (1) the order, statute, or rule violates constitutional provisions on its face or as applied; (2) the order is outside the agency's statutory authority or jurisdiction; (3) the agency has engaged in unlawful procedure or decision-making process, or it has failed to follow a prescribed procedure; (4) the agency has erroneously interpreted or applied the law; (5) substantial evidence does not support the order when viewed in light of the whole record; (6) the agency has not decided all issues requiring resolution; (7) a motion for disqualification was made and was improperly denied, or should have been made; (8) the order is inconsistent with an agency rule; or (9) the order is arbitrary and capricious. RCW 34.05.570.

ment failed to meet the 21-day filing deadline. Holding that the petition for review was timely filed, we disagree. Freeman argues that strict compliance with jurisdictional time limits for filing administrative appeals is required and that the 21-day filing period is calculated not from the corrected order's mailing date but from the initial order's mailing date. We disagree, because Freeman and the Department timely filed petitions for review within 21 days of the mailing of the corrected order.

¶12 Former WAC 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 (2002) provides:

(1) When a party requests a corrected initial or final order, the ALJ must either:

(a) Send all parties a corrected order; or

(b) Deny the request within three business days of receiving it.

(2) If the ALJ corrects an initial order and a party does not request review, the corrected initial order becomes final twenty-one calendar days after the original initial order was mailed.

(3) If the ALJ denies a request for a corrected initial order for a case listed in WAC 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(4) and the party still wants the hearing decision changed, the party must request review from [the Board].

(4) Requesting a corrected initial order for a case listed in WAC 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(4) does not automatically extend the deadline to request review of the initial order by [the Board]. A party may ask for more time to request review when needed.

(5) If the ALJ denies a request for a corrected final order and you still want the hearing decision changed, you must request judicial review.

¶13 The above rule does not address the situation here where an ALJ issued a corrected initial order and a party filed a request for review of the corrected order. On June 27, 2008, the ALJ issued its initial order after the administrative hearing. A few days later, the Department requested correction of clerical errors. On July 3, the ALJ issued a

corrected order. And the corrected order contained the following:

> **NOTICE TO PARTIES**: THIS ORDER BECOMES FINAL ON THE DATE OF MAILING UNLESS WITHIN 21 DAYS OF MAILING OF THIS ORDER A PETITION FOR REVIEW IS RECEIVED BY THE [DEPARTMENT] BOARD OF APPEALS . . . . A PETITION FORM AND INSTRUCTIONS ARE ENCLOSED.

CP at 550. Applying the corrected order's language, the corrected order did not become final because a petition for review was filed within 21 days of the order's mailing. Freeman filed a petition for review on July 16, and the Department filed its petition for review on July 22. Under the corrected order's terms both parties had until July 24 to petition for review.

¶14 Accordingly, we hold that the appeal was timely filed and subject matter jurisdiction properly conferred.

### III. SUPERVISORY CARE UNDER MEDICAID

¶15 Freeman next argues that she is entitled to reimbursement for the supervisory care services her treating physician prescribed. The Department argues general supervision is not an EPSDT service that the Department must provide because around the clock general supervision is not a covered type of "medical assistance" as defined by 42 U.S.C. § 1396d(a). The Department is correct. Because we hold that supervisory care services are not a covered type of medical assistance, we affirm the Board. Accordingly, we do not reach Freeman's remaining arguments.

### A. Standard of Review

¶16 We review the agency's final order rather than the superior court's decision.[5] *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). We review

---

[5] The superior court's and the agency's final actions both denied Freeman's claim for supervisory care under Medicaid.

conclusions of law de novo to determine if the reviewing judge correctly applied the law. *Morgan*, 99 Wn. App. at 151. We review an agency interpretation of federal law de novo under an error of law standard. *Samantha A. v. Dep't of Soc. & Health Servs.*, 171 Wn.2d 623, 629, 256 P.3d 1138 (2011).

¶17 Congress provides federal funds to the states to provide medical services for needy citizens through Medicaid. *In re Guardianship of Lamb*, 173 Wn.2d 173, 186, 265 P.3d 876 (2011). Washington's participation in Medicaid is voluntary, but once a state elects to participate, it must comply with Medicaid statutes and related regulations. *Samantha A.*, 171 Wn.2d at 630. States design and administer their Medicaid programs within broad federal guidelines. *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 396, 869 P.2d 28 (1994). The Department administers Medicaid medical assistance programs within this state. *Samantha A.*, 171 Wn.2d at 630.

¶18 The Medicaid Act requires state plans to have "reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Medicaid]." 42 U.S.C. § 1396a(a)(17). A Medicaid state plan must include certain services. *See* 42 U.S.C. §§ 1396d(a)(24), 1396a(a)(10). Additionally, personal care services are optional; states may provide these additional benefits. 42 C.F.R. § 440.225. Washington State has done so. As with all Medicaid services, states " 'may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.' " *Samantha A.*, 171 Wn.2d at 630 (quoting 42 C.F.R. § 440.230(d)). The Medicaid Act also gives the states "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.' " *Alexander v. Choate*, 469 U.S. 287, 303, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985) (quoting 42 U.S.C. § 1396a(a)(19)).

¶19 Although personal care services are optional, states must provide EPSDT services to all eligible individuals

under the age of 21.[6] 42 U.S.C. § 1396d(r). These services include (1) screening; (2) vision; (3) dental; (4) hearing; and (5) such other necessary health care, diagnostic services, treatment, and other measures described in 42 U.S.C. § 1396d(a) to correct or ameliorate defects and physical and mental illness and conditions discovered by the screening services, whether or not the state plan covers such services. 42 U.S.C. § 1396d(r).

¶20 Under 42 U.S.C. § 1396d(r)(5), the Department must provide EPSDT coverage consistent with a two-pronged inquiry: first, a requested service must fall within one of the 28 types of medical assistance[7] described in 42 U.S.C. § 1396d(a) and, second, such service must be necessary to correct or ameliorate the qualifying medical condition. *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 593 (5th Cir. 2004).

¶21 Here, the question we must answer is whether the supervisory care Freeman seeks falls within one of the 28 types of medical assistance described in 42 U.S.C. § 1396d(a). Finding that supervisory care does not fall within 42 U.S.C. § 1396d(a), we do not address whether supervisory care is necessary to correct or ameliorate Freeman's physical and mental conditions caused by her Down's syndrome and aphasia.

## B. General Supervisory Services Not Medical Assistance under 42 U.S.C. § 1396d(a)

¶22 First, Freeman argues that supervisory care is medical assistance under 42 U.S.C. § 1396d(a)(24) because supervisory benefits were formerly included in Washington's approved state plan as an MPC benefit; thus, they necessarily meet the definition of MPC in 42 U.S.C. § 1396d(a)(24)

---

[6] Freeman was under age 21 during the years at issue (2004, 2005, and 2006). Freeman turned 21 on July 18, 2007.

[7] Requested service may also fall within a catchall provision for all other remedial care recognized under state law. 42 U.S.C. § 1396d(a)(29).

and must be provided without limitation if prescribed in an EPSDT screening. Alternatively, Freeman argues supervisory care qualifies as medical assistance under 42 U.S.C. § 1396d(a)(13) because the services provide for the maximum reduction of Freeman's physical or mental disability.

¶23 The Department argues that general supervision is not a personal care service under 42 U.S.C. § 1396d(a)(24) because qualified personal care services in Washington State provide active physical and verbal assistance with specific enumerated tasks rather than the general, passive, or plain supervision of the ambiguous nature Freeman seeks here. The Department argues that around-the-clock general supervision is not a covered type of "medical assistance" as defined by 42 U.S.C. § 1396d(a) because it does not impact Freeman's disability, it does not improve or restore her functional level, and it is not an " 'other . . . rehabilitative service' " under 42 U.S.C. § 1396d(a)(13). DSHS Resp. Br. and Opening Br. on Cross-Appeal at 20 (quoting 42 U.S.C. § 1396d(a)(13)). The Department is correct.

¶24 Medicaid covers medical assistance benefits for those who qualify and whose income and resources are insufficient to meet all of their costs. The covered services are defined in 42 U.S.C. § 1396d(a). It lists 28 services, including the two Freeman argues apply here: personal care services and other medical or remedial services.

### 1. Personal Care Services

¶25 First, Freeman argues the care that she seeks is authorized by 42 U.S.C. § 1396d(a)(24), which provides:

> [P]ersonal care services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease that are (A) authorized for the individual by a physician in accordance with a plan of treatment or (at the option of the State) otherwise authorized for the individual in accordance with a service plan approved by the State,

(B) provided by an individual who is qualified to provide such services and who is not a member of the individual's family, and (C) furnished in a home or other location.

Freeman relies on former WAC 388-15-202(47) (1997), which was repealed in 2003, to support her assertion that personal care services include supervision for individuals like Freeman because the Department used to administer a program in Washington that included supervision in its definition for "personal care services." Because former statutes or regulations that have been repealed are not controlling or persuasive authority on which we may rely, we reject this argument.

¶26 Next, Freeman cites *S.D.* in support of her argument that supervisory care falls under 42 U.S.C. § 1396d(a)(24). 391 F.3d 581. In *S.D.*, a Medicaid recipient alleged that the agency deprived him of his federal statutory right to medical assistance by denying his claim for disposable incontinence underwear. 391 F.3d at 584. The issue was whether the incontinence underwear qualified as a "home health care service[ ]" under 42 U.S.C. § 1396d(a)(7). *S.D.*, 391 F.3d at 586-87. The *S.D.* court explained that the Centers for Medicare and Medicaid Services (CMS) had approved state Medicaid plans that expressly provide incontinence supplies under the home health care category of 42 U.S.C. § 1396d(a)(7). 391 F.3d at 596. Accordingly, it concluded that CMS's approval of state plans affording coverage for the provision of incontinence supplies means the agency construes 42 U.S.C. § 1396d(a)(7) to include the supplies and therefore they must be provided to EPSDT eligible children if necessary to correct or ameliorate a condition discovered by screening. *S.D.*, 391 F.3d at 596.

¶27 Freeman argues that because former WAC 388-15--202 included supervision as a personal care benefit under a prior approved state plan, that indicates that CMS considers it a personal care benefit and it must be provided without limitation if prescribed in an EPSDT screening. But the Department argues that former WAC 388-15-202

involved an entirely different assessment process for personal care that was repealed and replaced by the CARE tool before Freeman's 2004 assessment. The Department explains that personal care services were formerly assessed under a different tool, called "Legacy," and that the CARE tool was developed to replace Legacy following an audit and instruction by federal regulators. DSHS Resp. Br. and Opening Br. on Cross-Appeal at 26 n.24. The State argues that the former rule's existence does not indicate that CMS has approved a "personal care" definition that must include the general supervision that Freeman seeks.

¶28 Freeman does not explain why we should rely on the former WAC 388-15-202 that was used under an entirely different assessment tool to determine long term care services. Additionally, Freeman also does not show that the general supervisory services she requests were ever included in our state's plan or any other state Medicaid plan or that CMS ever explicitly approved former WAC 388-15-202. Thus, Freeman's reliance on *S.D.* is completely misplaced.

¶29 In Washington, an individual's personal care needs are assessed using the CARE tool. WAC 388-106-0075. The Department uses the CARE tool to assess an individual's ability to perform activities of daily living (ADL) and instrumental activities of daily living (IADL). WAC 388-106-0075. ADLs include bathing, bed mobility, body care, dressing, eating, locomotion inside and outside immediate living environment, medication management, toilet use, transfer between surfaces, and personal hygiene. WAC 388-106-0010. IADLs include meal preparation, ordinary housework, essential shopping, wood supply, travel to medical services, managing finances, and telephone use. WAC 388-106-0010. General supervision is not included in either of these lists the Department uses. Freeman does not argue why the Department's regulations should include general supervision or that the Department's rules do not comply with the Medicaid Act.

¶30 Finally, Freeman is unable to show that any other states include general supervision in their definition of personal care services under the Medicaid Act. Freeman's arguments are not persuasive.

## 2. Other Medical or Remedial Service

¶31 Next, Freeman argues the supervisory care she seeks is also authorized by 42 U.S.C. § 1396d(a)(13), which provides:

> [O]ther diagnostic, screening, preventive, and rehabilitative services, including any medical or remedial services (provided in a facility, a home, or other setting) recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level.

Citing *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 26 (D. Mass. 2006), Freeman argues that courts construing EPSDT requirements have ruled that so long as a competent medical provider finds specific care to be "medically necessary" to improve or ameliorate a child's condition, the 1989 amendments to the Medicaid statute require a participating state to cover it.

¶32 Freeman explains that the superior court erroneously found that the services she seeks were not remedial under 42 U.S.C. § 1396d(a)(13) because they were not restoring her to a prior ability level and that the trial court's analysis parallels the State of Ohio's unsuccessful defense in *Parents League for Effective Autism Services v. Jones-Kelley*, 565 F. Supp. 2d 905 (S.D. Ohio 2008). *Parents League* is clearly distinguishable from Freeman's case. The issue there was whether 42 U.S.C. § 1396d(a)(13) should be construed to include services that are either rehabilitative or habilitative. *Parents League*, 565 F. Supp. 2d at 915-17. But general supervision is neither; it does not restore or improve Freeman's functional ability. Freeman does not show how the services she seeks are either rehabilitative or

habilitative. That is, Freeman does not show how the requested services qualify as statutory medical assistance to restore or improve her functional ability.

¶33 General supervision is not a medical service because it is general in nature, including passive supervision when her parents are not even in the same room as Freeman, and it is not remedial because it does not seek to heal or restore any of Freeman's medical problems.

¶34 In its ruling, the Board explained that

the supervision being provided by the Freeman's [sic] is largely undefined and the most medically-related definition of it . . . is that it is the type of supervision that a parent provides to a toddler to ensure that no harm comes to the child based on their lack of judgment and lack of experience in the ways of the world.

This type of supervision, at its very core, is directly related to the quintessential protective and educational role of the parent. . . . [It] is not "remedial" in nature. It is therefore not medical. And, if it is not related to the medical treatment for an underlying condition, then it is simply not a covered service under the EPSDT program.

CP at 491.

¶35 In conclusion, we defer to the agency's interpretation of the applicable statutes and rules. *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 56, 239 P.3d 1095 (2010). Freeman is required to show (1) that the supervisory care she seeks is medical assistance within 42 U.S.C. § 1396d(a) and (2) that it is medically necessary. Freeman does not meet her burden to show the Board erred by finding general supervision services do not meet the requirements of 42 U.S.C. § 1396d(a)(13) or (24). Because Freeman fails to meet the first prong of this test, we need not analyze the second prong.

¶36 We hold that the Board correctly determined that general supervisory care is not medical assistance within 42 U.S.C. § 1396d(a)(13) or (24). Accordingly, we affirm the Board.

## IV. Benefit Eligibility Date

¶37 On cross appeal, the Department argues that Freeman did not complete program requirements to receive personal care until September 1, 2004, because her providers (her parents) did not receive authorization to provide those services until then. The Department asserts that requiring care provider approval before authorizing personal care services is a permissible Medicaid service utilization control. Freeman argues that she is entitled to Medicaid benefits on July 1 because although the Department did not specifically attach her service providers to her contract until September 2004, it had previously certified those providers in May. Freeman asserts that just because the Department did not process the paperwork until September does not reduce her benefit eligibility date. The Department and the Board are correct.

### A. Standard of Review

¶38 We review conclusions of law de novo to determine if the reviewing judge correctly applied the law. *Morgan*, 99 Wn. App. at 151. Reviewing courts give great deference to the agency because "the agency has expertise and insight gained from administering the regulation that the reviewing court does not possess." *Overlake Hosp. Ass'n*, 170 Wn.2d at 56.

### B. Analysis

¶39 We read two applicable rules together here. Former WAC 388-72A-0053 (2004) provides that an individual is eligible to receive MPC services upon the Department's service authorization date. And, 42 U.S.C. § 1396a(a)(34) says that a state's plan for medical assistance must provide that

in the case of any individual who has been determined to be eligible for medical assistance under the plan, such assistance

will be made available to him for care and services included under the plan and furnished in or after the third month before the month in which he made application . . . for such assistance if such individual was . . . eligible for such assistance at the time such care and services were furnished.

¶40 The Board found that Freeman was eligible for benefits beginning September 1, citing former WAC 388- -72A-0053, which says that eligibility to receive services *"begins upon the date of the department's service authorization."* CP at 496. The review judge explained that the Department approved Freeman's parents to be parent-care providers effective September 1 and that is the date Freeman should begin receiving benefits. He concluded:

There is no evidence in the record that indicates that either of them were [sic] approved to provide care prior to that time.

So what the evidence shows is that the Appellant became eligible for medical assistance in July and for MPC benefits on August 13, 2004, but did not have an eligible care provider approved until September 1, 2004. Based on the evidence taken at the hearing, since there was [not] an approved care provider until September 1, 2004, that is the date that the Department must begin paying for service care hours invoiced by the Appellant's parents. To find any date earlier than this . . . would be to ignore the clear requirement of [former] WAC [388-72A-0053].

CP at 496-97.

¶41 Freeman asserts that the review judge's conclusion that her eligibility date was September 1 contradicts federal Medicaid requirements. The only federal Medicaid statute she cites in support is 42 U.S.C. § 1396a(a)(34).

¶42 The first clause of 42 U.S.C. § 1396a(a)(34) provides, "[I]n the case of any individual who has been determined to be eligible for medical assistance under the plan," the state must provide medical assistance under the plan in or after the third month *before* she applied if she was eligible for the

assistance at the time the services were furnished. Freeman reads this to mean that she was eligible for assistance as soon as she turned 18 and is thus entitled to payment beginning in July. The State argues that 42 U.S.C. § 1396a(a)(34) is inapplicable. This section provides for medical assistance services to be covered up to three months *before* application is made for benefits. Freeman applied for benefits in July 2004, thus she does not request benefits before her application for benefits. She does not explain why this section is applicable here.

¶43 In addition, because a state can properly regulate the requirements for eligibility to a certain extent, Washington had determined that an individual was not eligible until she received service authorization from the Department. Former WAC 388-72A-0053. In Freeman's case, this was in September.

¶44 Also, while Freeman asserts that she was entitled to payment beginning in July because the Department certified her parents in May, the review judge specifically concluded that there was "no evidence in the record that indicates that either of them were [sic] approved to provide care prior to" September. CP at 496. Freeman cites no evidence to the contrary.

¶45 Freeman did not receive service authorization from the Department until her parents were approved as her care providers effective September 1, 2004. Thus, Freeman became eligible for payment September 1. We hold that the Board properly determined Freeman's eligibility date to be September 1 and that Freeman failed to show erroneous application of any law.

V. ATTORNEY FEES

¶46 The Department argues that the superior court abused its discretion in awarding Freeman attorney fees because the superior court did not provide an objective and reasonable basis for its award. Freeman argues that the

superior court's attorney fee award was based on Freeman's success in obtaining the benefits due her under the CARE tool, obtaining retroactive benefits, and reversing the Department's EPSDT holding.

¶47 Freeman is correct. RCW 74.08.080(3) provides when a person files a petition for judicial review of an adjudicative order entered in a public assistance program and the superior court, Court of Appeals, or Supreme Court renders a decision in favor of the appellant, said appellant shall be entitled to reasonable attorney fees and costs.

¶48 RCW 4.84.350(1) provides, "Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees." But RCW 4.84.350 does not apply here. The first sentence says "[e]xcept as otherwise specifically provided by statute." RCW 74.08.080 specifically provides for attorney fees by statute so it properly authorized the superior court's award here. *See Samantha A.*, 171 Wn.2d at 638.

¶49 A trial court abuses its discretion when it bases its decision on unreasonable or untenable grounds. *In re Marriage of Tang*, 57 Wn. App. 648, 653, 789 P.2d 118 (1990). Absent such a showing, we will not disturb the superior court's decision. *Clarke v. Equinox Holdings, Ltd.*, 56 Wn. App. 125, 132, 783 P.2d 82, *review denied*, 113 Wn.2d 1001 (1989). The superior court ruled that Freeman was entitled to 70 percent of her attorney fees and that Freeman's counsel's $200 per hour charge for the department appeal was reasonable. CP at 352 ("A reasonable estimate of the time spent by Ms. Freeman's counsel on successful claims is 70% of the total time spent on the case."). The superior court explained its 70 percent fee determination by stating (1) Freeman obtained relief on the state law issue, i.e., her eligibility for coverage under the state MPC services program; (2) Freeman obtained relief on her claim that she was

entitled to additional personal care hours due to her diagnosis of aphasia; (3) Freeman obtained relief on the issue of retroactivity; and (4) Freeman obtained relief in overturning the review judge's finding that EPSDT was limited to medical benefits, although ultimately her claim for additional services under EPSDT was denied. The court subtracted fees and costs associated with Freeman's unsuccessful motion on summary judgment for the jurisdictional issue. The superior court order cited RCW 74.08.080(3) and RCW 4.84.350.

¶50 The Department does not show how the superior court abused its discretion. The superior court supported its decision with reasons for its 70 percent calculation. Accordingly, we affirm the superior court's decision.

¶51 Finally, RAP 18.1 provides that the prevailing party on appeal has the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or the Supreme Court. Freeman is not the prevailing party on appeal; thus she is not entitled to an appellate award of attorney fees.

¶52 We affirm the Board and the Superior Court's award of attorney fees to Freeman.

HUNT, J., and BRIDGEWATER, J. PRO TEM., concur.

Reconsideration denied April 8, 2013.